**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

UNITED STATES OF AMERICA *ex rel.* JOSEPH
AMICO AND MATTHEW MAYERS,

                     *Plaintiff,*

                   v.

CITIGROUP, INC., CITIBANK NA, INC.;
CITIMORTGAGE, INC.; CITIGROUP MORTGAGE
LOAN TRUST, INC.; CITICORP MORTGAGE
SECURITIES, INC.; CITICORP RESIDENTIAL
MORTGAGE SECURITIES, INC.; CITIFINANCIAL
MORTGAGE SECURITIES, INC.; CITIGROUP
GLOBAL MARKETS, INC.; CITIGROUP GLOBAL
MARKETS REALTYCORP.,

                  *Defendant*s.

------------------------------------------------------------ X

14 Civ. 4370 (CS)

**SUPPLEMENTAL**
**DECLARATION**
**OF REBECCA C.**
**MARTIN**

      I, REBECCA C. MARTIN, declare the following under penalty of perjury pursuant to 28

U.S.C. § 1746:

      1.      I am an Assistant United States Attorney in the Civil Division for the United

States Attorney's Office for the Southern District of New York.

      2.      I make this supplemental declaration in support of the United States' Motion to

Dismiss.

      3.      Attached hereto as Exhibit 22 is a true and correct copy of the Complaint filed in

*SEC v. Citigroup Global Markets, Inc.*, 11 Civ. 7387 (JSR) (S.D.N.Y. filed Oct. 19, 2011) .

      4.      Attached hereto as Exhibit 23 is a true and correct copy of excerpts of the

transcript of the May 28, 2014 hearing in *United States ex rel. Szymoniak v. American Home

Mortgage Servicing et al.*, 0:10-cv-1465-JFA (D.S.C. filed Feb. 3, 2014) ("*Szymoniak I*").

5.     Attached hereto as Exhibit 24 is a true and correct copy of the docket sheet in

*Szymoniak 1.*

6.     Attached hereto as Exhibit 25 is a true and correct copy of the docket sheet in *U.S.*

*ex rel Szymoniak v. ACE Securities Corp. et al.*, 0:13-cv-00464-JFA (D.S.C., originally filed in

W.D.N.C. Nov. 12, 2010) ("*Syzmoniak 2*").

Dated:  New York, New York
        February *11*, 2015

REBECCA C. MARTIN
Assistant United States Attorney

JUDGE RAKOFF

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CIV 7387

| U.S. SECURITIES AND EXCHANGE COMMISSION, | COMPLAINT |
|---|---|
| Plaintiff, | 11-CV-_____ |
| v. | ECF CASE |
| CITIGROUP GLOBAL MARKETS INC., | |
| Defendant. | |

RECEIVED
OCT 19 2011
U.S.D.C. S.D.N.Y.
CASHIERS

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows against the defendant Citigroup Global Markets Inc. ("Citigroup Global Markets"):

### SUMMARY

1.   The Commission brings this securities fraud action against Citigroup Global Markets (along with certain affiliates, "Citigroup"), based on its role in the structuring and marketing of a largely synthetic collateralized debt obligation ("CDO") called Class V Funding III ("Class V III"). The investment portfolio for Class V III consisted primarily of credit default swaps ("CDS") referencing other CDO securities with collateral consisting primarily of subprime residential mortgage-backed securities ("RMBS"). As a result, the value of Class V III and its underlying investment portfolio was tied to the United States residential housing market. Citigroup structured and marketed this $1 billion "CDO-squared" in early 2007 when the U.S. housing market and securities linked to the U.S. housing market were already beginning to show signs of distress. CDO-squared transactions such as Class V III were designed to, and did, provide leveraged exposure to the housing market and therefore magnified the severity of losses suffered by investors when the United States housing market experienced a downturn.

2.    Citigroup's marketing materials for Class V III – including a pitch book and offering circular – represented that the investment portfolio was selected by Credit Suisse Alternative Capital, Inc. ("CSAC"), a registered investment adviser that was promoted as having experience and expertise in analyzing credit risk in CDOs, using an extensively described asset selection process.  The marketing materials failed to disclose to investors that Citigroup had exercised significant influence over the selection of $500 million of the assets in the Class V III investment portfolio, and that Citigroup had retained a short position in those assets.  Citigroup established its short position by entering into CDS on assets that it helped select for Class V III.  By taking a short position with respect to the assets that it had helped select, Citigroup profited from the poor performance of those assets, while investors in Class V III suffered losses.  The CDO securities on which Citigroup bought protection had a notional value of approximately $500 million, representing half of the Class V III investment portfolio.  The marketing materials Citigroup prepared and distributed to investors did not disclose Citigroup's role in selecting assets for Class V III and did not accurately disclose to investors Citigroup's short position on those assets.

3.    In sum, the marketing materials were materially misleading because they suggested that Citigroup was acting in the traditional role of an arranging bank, when in fact Citigroup had exercised significant influence over the selection of the assets and had retained a $500 million proprietary short position of the assets it had helped select, which gave Citigroup undisclosed economic interests adverse to those of the investors in Class V.

4.    Class V III closed on February 28, 2007.  At closing, Citigroup was paid approximately $34 million in fees for structuring and marketing Class V III.  On or about that date and in the following weeks, Citigroup sold approximately $343 million of Class V III

2

equity and mezzanine liabilities ("notes") to approximately fourteen (14) institutional investors ("Subordinate Investors"), all of whom received some or all of the marketing materials for Class V III. The Subordinate Investors included hedge funds, investment managers and other CDO vehicles. On or about March 16, 2007, Ambac Credit Products ("Ambac"), an affiliate of Ambac Assurance Corporation, a monoline insurance company, agreed to sell protection to an affiliate of Citigroup on the $500 million super senior tranche of Class V III, meaning that Ambac effectively invested in that tranche by assuming the credit risk associated with that portion of the capital structure via CDS in exchange for premium payments. The transaction with Ambac was intermediated by BNP Paribas ("BNP"), a European financial institution (together with Ambac, the "Super Senior Investors"). Citigroup provided the marketing materials for Class V III to Ambac and BNP in connection with their decision to sell protection on the super senior tranche of Class V III.

5.     By November 6, 2007, approximately 83% of the CDOs in the Class V III investment portfolio had been downgraded by rating agencies. Class V III declared an event of default on November 19, 2007. As a result of the poor performance of the investment portfolio, the Subordinate Investors and Super Senior Investors lost several hundred million dollars. Through its fees and its short positions, Citigroup realized net profits of at least $160 million in connection with Class V III.

6.     By engaging in the conduct described herein, Citigroup Global Markets violated Sections 17(a)(2) and (3) of the Securities Act of 1933 [15 U.S.C. §§77q(a)(2) and (3)] ("Securities Act") by negligently misrepresenting key deal terms, namely the process by which the investment portfolio was selected and Citigroup's financial interest in the transaction. The Commission seeks injunctive relief, disgorgement of profits, prejudgment

3

interest, civil penalties and other appropriate and necessary equitable relief from the defendant.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction and venue over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)].  Citigroup Global Markets transacts business in this judicial district and, in connection with certain of the acts, transactions, and courses of business described in the complaint, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange therein.

## DEFENDANT

8.     **Citigroup Global Markets Inc.** is the principal U.S. broker-dealer of Citigroup Inc., a global financial services firm headquartered in New York City.  Citigroup Global Markets structured and marketed Class V III.

## FACTS

### A.     THE STRUCTURE OF A CDO-SQUARED

9.     CDOs are debt securities collateralized by fixed income obligations, such as RMBS.  A CDO collateralized by bonds is known as a "cash CDO."  A CDO collateralized by tranches of other CDOs is called a CDO-squared.  Investors in a CDO-squared receive payments derived from the cash flows produced by the investment portfolio.  The securities in the investment portfolio are packaged and held by a special purpose vehicle ("SPV") that issues the notes.  Investors in a cash CDO-squared receive payments derived from the principal and interest paid by the underlying CDO tranches in the investment portfolio.

4

10.    The cash flows from the CDO-squared are distributed to the notes in a waterfall fashion, based on seniority.  The "super senior" tranche is at the top of the waterfall and thus has the first right to receive principal and interest.  It is considered to have the lowest likelihood of being affected by negative performance of the underlying collateral. Next in priority are the senior tranches, which are typically rated AAA or AA by the rating agencies.  Below the senior tranches are the "mezzanine" tranches, rated A and BBB, which are junior in priority and, therefore, carry more risk.  Below the mezzanine tranches are the subordinated notes, or equity, which are the first to experience losses based on negative performance of the underlying collateral.

11.    A CDO collateralized only by CDS is called a "synthetic CDO."  A CDS is an over-the-counter derivative contract that functions like insurance on a so-called "reference asset" or "reference issuer."  In a CDS transaction, a "protection buyer" makes periodic premium payments to a "protection seller."  In exchange, the protection seller promises to pay the protection buyer if the reference asset experiences a "credit event," such as a default. Because the protection seller generally receives premium payments while the reference asset is performing but suffers a principal loss if the reference asset defaults, the protection seller is considered to have a long position on the reference asset.  In contrast, because the protection buyer receives payments when the reference asset experiences a credit event, and thus declines in value, the protection buyer is considered to have a short position on the reference asset.  Investors in a synthetic CDO-squared receive payments derived from the periodic premium payments that the SPV receives from the protection buyers on the CDS into which the SPV entered.

5

12.    A hybrid CDO is a CDO collateralized by both cash assets (i.e. bonds) and synthetic assets (i.e. CDS).  Class V III was a hybrid CDO-squared.  Typically, in a CDO-squared with synthetic assets (such as Class V III), the arranging bank, i.e. the bank that structures and markets the transaction, plays the role of initial CDS asset counterparty.  In its role as initial CDS asset counterparty, the arranging bank typically acts through its trading desks as an intermediary between the CDO-squared SPV and other market participants.  If there is a collateral manager, the collateral manager identifies a counterparty for a CDS that it wants to include in the investment portfolio of the CDO-squared, and the arranging bank intermediates that trade (that is, sells protection to that counterparty and simultaneously buys protection from the CDO-squared) in exchange for a small "intermediation fee."  In addition, the arranging bank can itself negotiate with the manager to purchase protection from the CDO, either for an interested customer or the arranging bank's own account.  When the arranging bank trades with the CDO-squared under these circumstances, there is no intermediation fee.  If the arranging bank sells protection to one of its customers, it seeks to capture as profit the difference between what it pays for protection and what it charges its customer – the spread between the two trades.  When the arranging bank chooses to retain the protection for its own account, and does not have an offsetting long position in the same asset, the arranging bank has a "naked short" position.

13.    Prior to the closing date in a CDO-squared transaction, it is typical for the arranging bank to have acquired most of the collateral (whether cash or synthetic) on behalf of the CDO-squared.  During the resulting "warehouse" period, the arranging bank typically finances the acquisition of collateral and places that collateral in a segregated account or "warehouse."  If there is a collateral manager for the CDO-squared, it is the collateral

manager that directs what assets will be acquired by the warehouse.  In the case of a synthetic CDO-squared, the arranging bank, in its role as initial CDS asset counterparty, will buy protection from the warehouse.  When the CDO-squared transaction closes, the assets are transferred to the SPV, and the SPV becomes the protection seller.  The SPV uses the money from investors in the CDO-squared's notes to make any contingent payments due under the CDS if there are credit events on the assets in the reference portfolio.  Thus, once the arranging bank sells the CDO-squared notes to outside investors, those investors have effectively taken the long side of the underlying CDS transactions.

14.   The arranging bank for a CDO-squared typically profits from the fees it charges for structuring and marketing the transaction, any fees it receives for intermediating trades, and the spread it captures by buying protection from the CDO-squared and selling protection to its customers.

## B.   THE DEMAND FOR "SHORT" POSITIONS ON CDO TRANCHES

15.   During late 2006 and early 2007, certain hedge funds and other market participants came to believe that CDOs whose assets consisted primarily of BBB-rated subprime RMBS (so-called "mezzanine" CDOs) would experience significant losses, leading even the A-rated tranches of "mezzanine" CDOs to potentially become worthless.  These market participants sought to profit from a downturn in the United States housing market by buying protection through CDS on A-rated tranches of mezzanine CDOs originated in 2006.

16.   Citigroup's CDO trading desk was one of the most active traders of CDS referencing CDOs.  By late October 2006, Citigroup's CDO trading desk had a large number

7

of hedge fund customers seeking to buy protection on CDO tranches, particularly on tranches of certain mezzanine CDOs originated in 2006.

17.     The increased demand for protection in the market led to the widening of spreads that market participants were willing to pay for protection on A-rated tranches of CDOs. CDS assets are typically priced based on a spread over a risk free funding rate, such as LIBOR. All other things being equal, a wider spread on a CDS indicates a higher level of perceived riskiness in the reference asset. With this widening of spreads, internal discussions began at Citigroup about the feasibility of structuring and marketing a CDO-squared collateralized by A-rated tranches.

18.     At least part of Citigroup's rationale for pursuing such a transaction was that it would enable its CDO trading desk to establish a naked short position on A-rated tranches of certain mezzanine CDOs originated in 2006. These naked short positions would increase in value, and thus provide profits to Citigroup, in the event of a downturn in the United States housing market.

## C.    STRUCTURING OF CLASS V III – PHASE ONE

19.     Beginning in or around October 2006, personnel from Citigroup's CDO trading desk had discussions with personnel on Citigroup's CDO structuring desk about the possibility of the CDO trading desk establishing short positions in a specific group of assets by buying protection from a CDO-squared that Citigroup would structure and market. Personnel on Citigroup's CDO syndicate, trading, and structuring desks also discussed the possibility of having the CDO-squared purchase unsold CDO tranches from CDOs previously structured by Citigroup.

8

20.     Citigroup knew that representing to investors that an experienced, third-party investment adviser had selected the investment portfolio would facilitate the placement of the notes that the CDO-squared would issue.

21.     On or around October 19, 2006, Citigroup initiated discussions with CSAC about CSAC acting as collateral manager for the CDO-squared.  CSAC was a registered investment adviser that had previously acted as the collateral manager for several other CDOs.

22.     Also on or about October 23, 2006, the managing director on Citigroup's CDO trading desk ("Trading Desk Head") sent to a senior Citigroup CDO structurer a list of 21 recent-vintage, mezzanine CDOs on which the CDO trading desk wished to buy protection from the CDO-squared.

23.     On or about October 26, 2006, personnel from Citigroup's CDO syndicate, structuring, and trading desks discussed potential structures for the CDO-squared, as well as the possibility that Citigroup would short assets into the CDO-squared.  On or about October 27, a Citigroup CDO structurer distributed internally to Citigroup's CDO trading desk and others models of several  alternative CDO-squared structures, including models showing the potential profits to Citigroup from shorting assets into the CDO-squared.

24.     On or about October 30, 2006, the senior CDO structurer forwarded to the CDO salesperson who covered CSAC the list of 21 CDOs originally provided by the trading desk on or about October 23, 2006.

25.    On or about November 1, 2006, the CDO salesperson forwarded that list, along with four added names that he had received from the CDO trading desk, to CSAC, describing the list as CDOs that were "contemplated to be in the [CDO-squared] portfolio."

26.    On or about November 2, 2006, the Trading Desk Head informed the senior CDO structurer that CSAC appeared "amenable to the portfolio" and "receptive to the concept," and asked the senior CDO structurer to draft an engagement letter for CSAC.

27.    On or about November 3, 2006, the senior CDO structurer drafted an engagement letter for CSAC and circulated it internally with the subject line "CSAC CDO-squared." Later that day, in response to receiving the draft engagement letter, the senior CDO structurer's immediate supervisor inquired, "Are we doing this?" The structurer responded: "I hope so. This is [Trading Desk Head]'s prop trade (don't tell CSAC). CSAC agreed to terms even though they don't get to pick the assets." The term "prop trade" is shorthand for "proprietary trade," meaning a trade undertaken for a firm's own account, rather than on behalf of the firm's customer(s).

C.    **STRUCTURING OF CLASS V III – PHASE TWO**

28.    In late December 2006, CDS spreads on single-A CDO tranches widened further, and Citigroup renewed its efforts to finalize the engagement with CSAC and move forward with the CDO squared. As a result of those efforts, CSAC and Citigroup agreed to proceed with the transaction.

29.    On or about December 21, 2006, CSAC sent an email to Citigroup with the subject line "List of CDOs" that read in relevant part, "here are a list of deals – a lot are ones

10

that we own some part of the capital structure in one or more of our deals . . . Also, I have added some other deals that I am familiar with." The 127 names on CSAC's list were diversified by deal type and vintage, with only a portion represented by recent-vintage, mezzanine CDOs. The list included approximately 19 of the original 25 names Citigroup provided CSAC on November 1, 2006. The Citigroup CDO salesperson forwarded a copy of the list to the CDO trading, structuring, and syndicate desks.

30.     On or about the morning of January 8, 2007, Citigroup's CDO trading desk selected 25 CDOs from CSAC's December 21, 2006 list and provided the 25 names to the Citigroup CDO salesperson. All but one of the 25 names were 2006, mezzanine CDOs; the sole exception was a mezzanine CDO that closed in December 2005. Sixteen of the 25 names that Citigroup selected had been on the list that Citigroup provided to CSAC on November 1, 2006. Later in the morning on January 8, 2007, the Citigroup CDO salesperson sent the list of 25 names to CSAC with the statement, "Here are the names where we would like to buy protection from CSAC." Within an hour, CSAC agreed to include the 25 names in the investment portfolio by selling protection on those names to Citigroup. The notional amount of CDS referencing these CDOs was $250 million.

31.     On or about January 8, 2007, Citigroup and CSAC entered into an engagement letter pursuant to which Citigroup agreed to serve as "Placement Agent," and CSAC agreed to serve as "Manager" for Class V III. Pursuant to the Engagement Letter, it was the responsibility of CSAC to "identify Collateral" and "direct the purchase of securities" for the investment portfolio.

11

32.     On or about January 10, 2007, CSAC selected 18 additional CDO tranches on which protection would be sold for the investment portfolio with little or no involvement from Citigroup. The counterparties that would buy protection were identified using a "bid wanted in competition" or "BWIC" process, pursuant to which a list of bonds is submitted to various brokers to solicit bids for protection. The notional amount of these CDO tranches was approximately $220 million.

33.     On or about, January 11, 2007, Citigroup and CSAC agreed to increase the size of the Class V III transaction from $500 million to $1 billion.

34.     On or about January 12, 2007, Citigroup and CSAC reached an agreement pursuant to which CSAC doubled the credit exposure of Class V III to the original 25 CDOs that Citigroup had selected on January 8 by selling additional protection to Citigroup at agreed-upon premiums. The notional amount of the CDO tranches to which the additional protection related was again $250 million, which increased Citigroup's short position to approximately $500 million, representing one-half of Class V III's investment portfolio.

35.     Of the $500 million of short positions Citigroup purchased on January 8 and 12, 2007, $490 million were naked shorts.

36.     Between approximately January 12, 2007, and February 12, 2007, CSAC selected additional CDOs to include via CDS in the investment portfolio with little or no involvement from Citigroup. The notional amount of the CDS on these CDOs was approximately $150 million. This brought the total notional amount of synthetic CDOs included in the investment portfolio for Class V III to $870 million.

12

37.    The investment portfolio for Class V III also included nine cash CDO tranches with a total notional amount of $130 million.  Six of these nine cash CDO tranches, with a face value of $92.25 million, were from CDOs structured and marketed by Citigroup.

38.    On or about February 14, 2007, the Trading Desk Head communicated to Citigroup's Risk Management organization the CDO trading desk's intention to retain the short position in the Class V III collateral even if Citigroup sold all of the tranches of Class V III.  In other words, Citigroup was positioned to profit from the negative performance of the Class V III collateral even as it was marketing Class V III to investors.

D.    **DISCLOSURES RELATING TO PORTOLIO SELECTION AND FINANCIAL INTERESTS**

39.    The two primary marketing documents for Class V III were the offering circular (similar in content to a prospectus in a registered offering) and the pitch book (a PowerPoint presentation provided to potential investors).  Both were prepared by Citigroup personnel, including the senior CDO structurer, and used by Citigroup to market the transaction to prospective investors.  Citigroup was responsible for ensuring the accuracy and completeness of the marketing documents.

40.    Citigroup's February 2007 pitch book for Class V III, which was finalized on or about February 5, 2007, represented that CSAC was the "collateral manager" and "Manager," and that the collateral for Class V III had been "selected" by CSAC.  The "Manager" section of the pitch book, a 20-page section provided by CSAC and which included a disclaimer stating that its contents were not independently verified by Citigroup, gave an overview of CSAC; described CSAC's track record and investment philosophy; and, most significantly, included a

13

detailed, 9-page section titled "Portfolio Construction and Management," describing CSAC's purportedly rigorous approach to the selection of assets for the investment portfolios of CDOs managed by CSAC. Neither the "Manager" section nor any other part of the pitch book included any reference to the role played by Citigroup in selecting a substantial portion of the Class V III investment portfolio. Citigroup knew or should have known that the pitch book, by failing to disclose Citigroup's role in the selection of the investment portfolio, was inaccurate and misleading.

41.     In particular, the Citigroup structurers responsible for the marketing documents should have known that it was misleading to represent that the collateral had been selected by CSAC through the selection process described in the documents. On or around February 6, 2007, a prospective investor in Class V III asked Citigroup to arrange a call with CSAC, to seek an explanation as to why CSAC had chosen to invest in several "static" deals (i.e. deals with non-managed portfolios). Each of the static transactions in the portfolio seen by the potential investor had been selected by Citigroup on January 8. After hearing that the potential investor was raising questions, the head of Citigroup's CDO syndicate desk sent an internal email to several recipients, including the senior CDO structurer stating: "[CSAC] bought these static bonds and . . . should have a rationale as to why [CSAC] found them attractive." One of the structurers who had been on the call with the potential investor and CSAC responded, "[CSAC] can come up with some stories for some of the static deals in Class V pool, but not all of them."

42.     On or about February 26, 2007, Citigroup finalized an offering circular for Class V III. The cover page of the offering circular represented that CSAC "will act as the Manager for the portfolio of assets." The offering circular made at least six separate

14

representations that the investment portfolio was "selected" by CSAC.  A section titled "The Manager," drafted by CSAC, describes CSAC's expertise and experience with CDO management and asset selection and includes a representation that "selection of the Eligible Collateral Debt Securities is based primarily on structural and credit analysis as well as technical factors which may influence trading levels and pricing."  Nothing in the offering circular included any reference to the role played by Citigroup in selecting the Class V III investment portfolio.

43.     Both the pitch book and the offering circular contained disclosure concerning Citigroup's role as "Initial CDS Asset Counterparty," including explanation of potential conflicts of interest resulting from Citigroup assuming that role. Page 88 of the 192-page offering circular included a statement that "[t]he Initial CDS Asset Counterparty may provide CDS Assets as an intermediary with matching off-setting positions requested by the Manager or may provide CDS Assets alone without any off-setting positions."  These disclosures did not provide any information about the extent of Citigroup's interest in the negative performance of the collateral in Class V III, or that Citigroup already had short positions in $500 million of the collateral.

44.     Notwithstanding that Class V III was structured as a "prop trade," *i.e.* a vehicle into which Citigroup *would* short assets for its own account, Citigroup did nothing to ensure that the marketing documents accurately disclosed Citigroup's actual interests in the collateral.

45.     The pitch book and offering circular were materially misleading because they failed to disclose that:

a.  Citigroup had played a substantial role in selecting assets for Class V III;

15

b.  Citigroup had taken a $500 million short position on the Class V III collateral for its own account, including a $490 million naked short position; and

c.  Citigroup's short position was comprised of names it had been allowed to select, while Citigroup did not short names that it had no role in selecting.

46.   Taken together, the misleading and inaccurate disclosures led investors to believe that the Class V III investment portfolio was selected by CSAC pursuant to a rigorous selection process and that Citigroup and its affiliates would merely act in the traditional role of an arranging bank in such a transaction.  Nothing in the disclosures put investors on notice either that Citigroup's role in the transaction actually included significant influence on the asset selection process, and a $500 million short position on the assets that it had helped select, or that, as a result of that role, Citigroup had interests that were adverse to the interests of investors.

E.   **CLASS V III'S INVESTORS**

47.   Beginning in late January 2007, Citigroup undertook efforts to offer and sell the Class V III tranches.  These efforts involved offering Class V III broadly through the CDO sales group to many of Citigroup's institutional clients, including a variety of hedge funds; asset managers, including CDO managers; and both US and foreign financial institutions. Citigroup provided the pitch book and offering circular to prospective investors.  The offering circular and/or pitch book were distributed by email sent from Citigroup's New York offices.

48.   Ultimately, approximately 15 different investors purchased (or sold protection on) tranches of Class V III with a face value of approximately $843 million.

16

49.    The largest investor in Class V III was Ambac, a monoline insurer headquartered in New York City.  Ambac was first approached by Citigroup on or about January 12, 2007, about writing protection on the super senior tranche of Class V III.  In January and February 2007, Citigroup conducted extensive discussions with Ambac about the terms of Ambac's investment in Class V III.  As part of its due diligence process, Ambac received multiple drafts of the offering circular from Citigroup.

50.    Ambac typically invested in CDOs with portfolios selected by a collateral manager.  Ambac's internal documents relating to the approval of Ambac's investment in Class V III contain extensive discussion of CSAC's purported expertise and asset selection process and emphasize the importance of CSAC's "perceived disciplined approach to the selection of securities."

51.    Ambac was unaware of either Citigroup's approximately $500 million naked short position in Class V III, or the extent of Citigroup's influence on the selection of assets. Knowledge of Citigroup's actual role in the transaction would have been important to the investment decision of a reasonable investor.

52.    Class V III closed on February 28, 2007.  Effective March 16, 2007, Ambac agreed to sell protection on the $500 million super senior tranche of Class V III, meaning it effectively invested in that tranche by assuming the credit risk associated with that portion of the capital structure via CDS in exchange for premium payments.  The super senior transaction with Ambac was intermediated by BNP.  This meant that, through a series of CDS, BNP assumed the credit risk associated with the super senior tranche of Class V III in the event, and only to the extent, that Ambac was unable to pay.

17

53.   The CDS transactions between and among Citigroup, Ambac and BNP relating to the super senior tranche of Class V III were entered into, in whole or in part in New York, New York. Each CDS transaction was subject to an agreement between the relevant parties that the transaction would be governed by the laws of the state of New York.

54.   Citigroup also offered and sold notes with a par value of $343 million to the Subordinate Investors, a group of approximately fourteen (14) institutional investors including hedge funds, investment managers and other CDO vehicles. Citigroup provided the Subordinate Investors with marketing materials for Class V III, including the pitch book and offering circular.

55.   At the time of their investments in Class V III, the Subordinate Investors were unaware of Citigroup's role in selecting the investment portfolio, and many considered experience as a collateral manager and rigorous asset selection process to be important to their investment decision. One wrote in an internal investment memorandum, "We do think CSAC has a strong record in selecting good portfolios, but we are not 100% comfortable with their asset selection in this case, but since their franchise and structured credit platform is generally strong . . . we felt comfortable with this transaction."

56.   Citigroup offered and sold the notes in New York, New York, and delivered them to the Subordinate Investors in book-entry form through the Depository Trust Company in New York, New York on or about the closing date.

57.   Neither at the time that Class V III closed, nor when the CDS transactions with the Super Senior Investors took place, did Citigroup disclose to any of the investors that it had

18

taken a $500 million short position, including a $490 million naked short position, on the assets in the Class V III investment portfolio.

### E.   THE PERFORMANCE OF CLASS V III

58.   Certain sophisticated market participants criticized Class V III's investment portfolio as the transaction was being marketed to investors. One experienced CDO trader characterized the portfolio as "a collection of dogsh!t" and "possibly the best short EVER!". An experienced CDO collateral manager commented, "the portfolio is horrible."

59.   By late July 2007, 14 of the 58 assets in the Class V III portfolio had been placed on negative watch by one or more rating agency. Eleven of those 14 assets were assets Citigroup had selected on January 8 and on which Citigroup had a naked short position. By early November 2007, approximately 33.4% of all of the assets in Class V III had been downgraded.

60.   The 25 names that Citigroup selected for Class V III performed significantly worse than other names in Class V III and significantly worse than the approximately 102 other names on the list CSAC provided to Citigroup on December 21, 2006, that were not included in Class V III.

61.   On November 7, 2007, Moody's downgraded every tranche of Class V III, and, on November 19, 2007, as a result of the severity of the downgrades of the underlying collateral, Class V III was declared to be in an Event of Default, meaning that the CDO was failing certain tests meant to judge its ability to repay the notes. Any remaining cash flows,

therefore, would be directed to the super senior tranche exclusively. The Subordinate Investors lost most, if not all, of their principal when their notes became nearly worthless.

62.     Ambac began suffering losses on the super senior tranche of Class V III towards the middle of 2008 and settled its exposure toward the end of that year after experiencing significant financial distress attributable to its losses on subprime securities, including CDOs such as Class V III. BNP has suffered additional losses on the super senior tranche of Class V III.

63.     Citigroup was paid approximately $34 million in fees for structuring and marketing Class V III and, as a result of its fees and its short positions on $500 million of assets in the Class V III investment portfolio, Citigroup realized net profits of approximately $160 million in connection with Class V III.

## CLAIM FOR RELIEF

### Sections 17(a)(2) and (3) of the Securities Act

64.     Paragraphs 1-63 are realleged and incorporated herein by reference.

65.     As set forth above, Citigroup Global Markets, in the offer or sale of securities or securities-based swap agreements, by the use of the means or instruments of interstate commerce or by the mails, directly or indirectly, obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities in violation of Sections 17(a)(2) and (3) of the Securities

Act [15 U.S.C. § 77q(a)(2) & (3)].  A violation of Sections 17(a)(2) or (3) of the Securities Act

may be established by a showing of negligence.  See Aaron v. SEC, 448 U.S. 680, 697 (1980).

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.     Permanently restraining and enjoining Citigroup Global Markets from violating

Sections 17(a)(2) and (3) of the Securities Act of 1933 [15 U.S.C. §77q(a)(2) and (3)];

B.     Ordering  Citigroup Global Markets to disgorge all profits that it obtained as a

result of its conduct, acts or courses of conduct described in this Complaint, and to pay

prejudgment interest thereon;

C.     Ordering Citigroup Global Markets to pay civil monetary penalties pursuant to

Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t (d)(2)]; and

D.     Granting such other and further relief as the Court shall deem just and proper

Dated:  Washington, D.C.
        October 19 , 2011

Respectfully submitted,

*Reid A. Muoio*

Kenneth Lench
Reid A. Muoio (RM-2274)
Andrew Feller
Thomas D. Silverstein

Jeffrey Infelise

Attorneys for Plaintiff
Securities and Exchange Commission
100 F St., NE
Washington, D.C. 20549-4010
(202) 551-4904 (Infelise)
infelisej@sec.gov

21