UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

UNITED STATES OF AMERICA, ex rel. JOSEPH AMICO
AND MATTHEW MAYERS,

                                 Plaintiffs/Relators,

       – against –

CITIGROUP, INC., *et al.*,

                                   Defendants.

------------------------------------------------------------------------x

**OPINION AND ORDER**

No. 14-CV-4370 (CS)
(UNDER SEAL)

Appearances:

Rebecca C. Martin
Assistant United States Attorney
Southern District of New York
New York, New York
*Counsel for Plaintiff United States of America*

Stephen B. Meister
Stacey M. Ashby
Remy J. Stocks
Meister Seelig & Fein, LLP
New York, New York
*Counsel for Relators Joseph Amico and Matthew Mayers*

Seibel, J.

      Before the Court is the United States' motion to dismiss the complaint pursuant to 31

U.S.C. §§ 3730(b)(5), 3730(c)(2)(A), 3730(e)(3), and 3730(e)(4).   For the following reasons, the

motion is granted.

# I.     BACKGROUND[1]

Plaintiffs/Relators Joseph Amico and Matthew Mayers ("Relators") brought this action

on behalf of the United States pursuant to the *qui tam* provisions of the False Claims Act

("FCA"), 31 U.S.C. §§ 3729-3733, against Defendants Citigroup, Inc. ("Citi") and its

subsidiaries Citibank, N.A., Inc. ("Citibank"); CitiMortgage, Inc. ("CitiMortgage"); Citigroup

Mortgage Loan Trust, Inc. ("CMLTI"); Citicorp Mortgage Securities, Inc. ("CMSI"); Citicorp

Residential Mortgage Securities, Inc. ("CRMSI"); CitiFinancial Mortgage Securities, Inc.

("CFMSI"); Citigroup Global Markets, Inc. ("Global Markets"); and Citigroup Global Markets

Realty Corp. ("Realtycorp").  Relators are former employees of Global Markets – Amico from

2000 to 2002 and Mayers from 1997 to 2003.  (*See* Compl. ¶ 14.)[2]

Relators allege that Defendants submitted false claims to the Government in connection

with Defendants' marketing and sale of residential mortgage-backed securities ("RMBS"), in

violation of 31 U.S.C. § 3729(a)(1)(A).  RMBS may generally be described as follows:

> an [R]MBS is created when a "depositor" buys an inventory of
> mortgages (or "loan pool") from a primary lender (or "originator").
> After the depositor obtains the loan pools, it places them in issuing
> trusts, securitizes them by organizing the loans into "tranches," and

---

[1] The parties have not briefed the issue of whether materials outside the Complaint may be considered on the instant motion, and the answer is not obvious, given that the Government has not styled the motion as one under Fed R. Civ. P. 12.  (*See* United States's Notice of Motion (requesting dismissal pursuant to the False Claims Act).)  The parties apparently both believe, however, that consideration of such materials is appropriate, in that they have submitted voluminous evidentiary exhibits and declarations from parties and counsel, and the Court agrees.  The Government's motion under 31 U.S.C. § 3730(c)(2)(A) is analogous to a voluntary dismissal, *see Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772 (2000) (referring to the "Government's voluntary dismissal of the suit" under § 3730(c)(2)(A)), and courts – if they get involved in a voluntary dismissal at all, which, under Rule 41(a)(1), they ordinarily do not – may consider evidence outside the pleadings in considering voluntary dismissals under Rule 41(a)(2), *see, e.g., Hinfin Realty Corp. v. Pittston Co.*, 206 F.R.D. 350, 352 (E.D.N.Y. 2002).  The Government's motion under 31 U.S.C. § 3730(e)(4) is, as explained below, equivalent to a motion under Rule 12(b)(1) for dismissal for lack of subject matter jurisdiction, in connection with which a court may likewise consider evidence outside the pleadings.  *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  The Court does not reach the merits of the Government's remaining arguments.  In any event, for purposes of this motion, the allegations in the Complaint are accepted as true, and the facts presented below are undisputed except as noted.

[2] "Compl." refers to the Complaint filed under seal on June 17, 2014, a copy of which is attached to the Declaration of Joseph Amico, dated December 18, 2014 ("Amico Decl."), as Exhibit A.

> issues securities backed by the loan pools. The depositor uses the borrowers' monthly payments as the revenue stream to pay investors who have bought the securities. Each tranche has a different risk profile and is assigned a credit rating . . . . Because the value of an [R]MBS depends on the ability of the borrowers to repay the principal and interest on the underlying loans as well as the adequacy of the collateral in the event of default, thorough assessments of the borrowers' creditworthiness and the homes' values are paramount.

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 751-52

(S.D.N.Y. 2012).  Relators allege that Defendants participated in all phases of this process:

Realtycorp acted as "sponsor" by purchasing mortgage loans, determining the structure of the

securitization, and providing data to credit rating agencies, (Compl. ¶¶ 83-85); CMLTI, CMSI,

CRMSI, and CFMSI acted as "depositors" by purchasing the loans from the sponsors, conveying

the loans to the trustee of the RMBS trust, and preparing and filing Registration Statements

pursuant to which the RMBS were offered for sale, (*id.* ¶ 85); Citibank acted as trust

administrator and custodian by holding the original mortgages, notes, assignments, and other

documents in secure facilities, (*id.* ¶ 86); Global Markets acted as lead underwriter by

underwriting and managing the sale of RMBS and conducting due diligence to ensure that the

Registration Statements were accurate, (*id.* ¶ 87); and CitiMortgage originated loans and sold

them through securitizations, (*id.* ¶ 88).  The Registration Statements included a prospectus,

prospectus supplement, and other documents including the pooling and servicing agreement,

mortgage loan purchase agreement, underwriting agreement, and loan tapes. (*Id.* ¶ 3.)  The loan

tapes listed the loans within the RMBS loan pool with columns of figures for each loan. (*Id.* ¶ 44

n.13.)  The headings of these columns, however, were either abbreviated or not defined, (*id.*),

and the loans were identified by loan number only, (*id.* ¶ 32 n.5).  Thus, the identity of the

borrower and property of each loan was not readily apparent from the loan tapes.

3

Defendants used the RMBS to create other financial products: they securitized the RMBS and used them as collateral for a second-tier financial product called collateralized debt obligations ("CDOs"). (*Id.* ¶ 99.) Like RMBS, the performance of the CDOs was ultimately tied to the performance of the underlying mortgage loans. (*Id.*) The CDOs were sold pursuant to offering circulars, pitch books, and other written materials (collectively, "Offering Documents"). (*Id.* ¶ 3.) Defendants also issued securities from "Structured Investment Vehicles" ("SIVs"), which used CDOs and RMBS, among other securities, as collateral. (*Id.* ¶¶ 106-09.) Defendants sold RMBS, CDOs and SIVs to Government entities, including the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). (*See id.* ¶¶ 22, 142.)

Relators allege that they undertook a loan-level review of certain mortgage notes underlying Defendants' RMBS. (*Id.* ¶¶ 31-32.) Relators studied a random sample of 675 loans from an RMBS trust titled CMLTI 2007-AMC1, which closed on March 9, 2007, and contained a total of 7,434 loans. (*Id.* ¶¶ 32-33.) They investigated 50 borrowers and 50 properties from among the 675 loans. (*Id.* ¶¶ 41, 60.) The investigation led to the following conclusions: (1) few, if any, valid assignments of mortgage notes were actually delivered to the CMLTI 2007-AMC1 trust by the closing date, (*id.* ¶ 34); (2) many of the reviewed borrowers had characteristics indicating they were likely to default on their mortgages, such as owning multiple properties, (*id.* ¶ 51), having multiple mortgages and inadvisable debt-to-income ratios, (*id.* ¶¶ 51-53), or not occupying the homes for which they took out mortgages (but representing that they did), (*id.* ¶¶ 54-56); and (3) many of the reviewed properties and the properties underlying the reviewed borrowers' mortgages were appraised at artificially high values, and thus the loan-to-value ratios reported for each property were artificially low, (*id.* ¶¶ 61-62). Relators allege

4

that each of these findings contradicts a warranty made in CMLTI 2007-AMC1's Registration Statement or constitutes material information that Defendants failed to disclose. They assert that CMLTI 2007-AMC1 is representative of all of Citi's RMBS, (*see id.* ¶ 32 n.4), and extrapolate that each of the many RMBS trusts listed in the Complaint, (*id.* Annex A), suffered from the same defects, (*see id.* ¶¶ 112-13). Relators thus allege that Defendants either knowingly or recklessly misrepresented or failed to disclose the above facts in their RMBS Registration Statements, (*id.* ¶¶ 112-19), provided the same false information to credit rating agencies, (*id.* ¶¶ 120-22), failed to comply with the loan underwriting guidelines set forth in the RMBS prospectus supplements, (*id.* ¶¶ 123-32), and failed to conduct due diligence sufficient to prevent these things from happening, (*id.* ¶¶ 91-98).

Relators allege that the CDOs suffered from the same defects as the RMBS, because the loans underlying the RMBS also underlay the CDOs. Relators also assert that Defendants purchased certain unsold CDOs, repackaged them as "CDO-squared," and subsequently took a short position on the new securities (in other words, bet that their price would fall). (*Id.* ¶ 104.) Thus, with respect to the CDOs, Relators allege that Defendants failed to disclose in the Offering Documents the same information they failed to disclose in the RMBS Registration Statements, and failed to disclose their short position in Citi CDOs. (*Id.* ¶¶ 135-37.) Relators likewise allege that Defendants failed to disclose the same issues to purchasers of SIVs. (*Id.* ¶ 110.)

Relators filed the Complaint under seal on June 17, 2014. On July 7, 2014, the Government contacted Amico (then representing himself) and obtained his consent to a partial unsealing of the case in order to disclose the Complaint to Defendants. (*See* Amico Decl. Ex. H.) Relators' counsel contacted the Government the next day and affirmed Relators' consent.

(Meister Decl. Ex. G.)[3]  The Court granted the Government's request for a partial unsealing on July 10, 2014, and the Government submitted the Complaint to Defendants the same day.  (*Id.*; Order Dated July 10, 2014; Grigsby Decl. ¶ 3.)[4]

On July 11, 2014, the Government entered into a settlement agreement with Citi, which was made effective July 14, 2014.  (Grigsby Decl. ¶ 5, Ex. A.)  The settlement resolved the Government's claims against Citi "for violations of federal laws in connection with the packaging, marketing, sale, structuring, arrangement, and issuance of RMBS and CDOs."  (*Id.* Ex. A ¶ A.)  Pursuant to the settlement, Citi paid $4 billion to the Federal Government, paid a total of $500 million to five states and the Federal Deposit Insurance Corporation, and committed to providing $2.5 billion in consumer relief.  (*Id.* Ex. A ¶¶ 1(A)-(F), 2.)  Relators' claims were specifically excluded and not released under the settlement agreement.  (*Id.* Ex. A ¶ 12(i)(ii).)

Also on July 11, 2014, the Government requested a pre-motion conference on its anticipated motion to dismiss under 31 U.S.C. § 3730(c)(2)(A).  (*See* Endorsed Letter from Rebecca C. Martin, dated July 11, 2014.)  A pre-motion conference was held on August 1, 2014. This motion followed.

## II.   DISCUSSION

### A. The FCA

The *qui tam* provisions of the FCA permit private parties to bring suits on behalf of the United States to enforce the Act's prohibitions against the submission of false claims to the Government. *See* 31 U.S.C. § 3730(b)(1).  If a *qui tam* action has been brought, the United

---

[3] "Meister Decl." refers to the Declaration of Stephen B. Meister, dated December 19, 2014.

[4] "Grigsby Decl." refers to the Declaration of Stacey K. Grigsby, dated October 7, 2014.

States may intervene and take control of the action. *Id.* § 3730(b)(2). Even where the Government decides not to intervene, it may still move to dismiss the suit. *See U.S. by Dep't of Defense v. CACI Int'l Inc.*, 953 F. Supp. 74, 77 (S.D.N.Y. 1995); *see also Hughes Aircraft Co. v. U.S. ex rel. Schumer*, 520 U.S. 939, 943 n.2 (1997) (suggesting that government need not intervene in order to move to dismiss action). Section 3730(c)(2)(A) provides that the "Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." 31 U.S.C. § 3730(c)(2)(A); *see U.S. ex rel. Piacentile v. Amgen Inc.*, No. 04-CV-3983, 2013 WL 5460640, at *2 (E.D.N.Y. Sept. 30, 2013). When the Government chooses to dismiss pursuant to this section, "the court need not, in order to dismiss, determine that the [G]overnment's decision is reasonable." *U.S. ex rel. Stevens v. Vt. Agency of Natural Res.*, 162 F.3d 195, 201 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 765 (2000).

### B. Dismissal Under Section 3730(c)(2)(A)

There is disagreement between the parties and among courts as to what standard of review – if any – is applicable to the Government's motion to dismiss a *qui tam* complaint under § 3730(c)(2)(A). The Ninth and Tenth Circuits adhere to a test established in *U.S. ex rel., Sequoia Orange Co. v. Baird-Neece Packing Corp.*, which requires the Government to first identify "a valid government purpose" and "a rational relation between dismissal and accomplishment of the purpose" before shifting the burden to the relator to "demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." 151 F.3d 1139, 1145 (9th Cir. 1998) (internal quotation marks omitted); *see Ridenour v. Kaiser-Hill Co.*, 397 F.3d 925, 936 (10th Cir. 2005) (adopting *Sequoia* test). The D.C. Circuit, in contrast, has read § 3730(c)(2)(A) as giving

the Government "an unfettered right to dismiss" a *qui tam* complaint before intervention by the Government or service on the defendant(s).  *See Swift v. United States*, 318 F.3d 250, 252 (D.C. Cir. 2003).  Under the D.C. Circuit's view, the Government's decision to dismiss is presumptively "unreviewable," with the possible exception of cases of "fraud on the court."  *Id.* at 252-53; *see Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 65 (D.C. Cir. 2008) ("[The Government's] decision to dismiss the case, based on its own assessment, is not reviewable in the district court or this court.").

The Second Circuit, for its part, has not decided the proper standard to be applied, *see U.S. ex rel. Pentagen Techs. Int'l Ltd. v. United States*, No. 00-CV-6167, 2001 WL 770940, at *7 (S.D.N.Y. July 10, 2001), but has cited the *Sequoia* standard with approval, albeit in *dictum* in a case reversed on other grounds by the Supreme Court, *see Stevens*, 162 F.3d at 201.  Since *Stevens*, at least one court in this Circuit has found the *Swift* standard the more persuasive of the two.  *See Piacentile*, 2013 WL 5460640, at *2-3 (court was "fully persuade[d]" by *Swift*, but found Government met the *Sequoia* standard).

While this Court is more inclined toward *Swift* than *Sequoia*,[5] the question need not be resolved because dismissal is required under either standard.  *See U.S. ex rel. Wickliffe v. EMC*

---

[5] In addition to the persuasive reasoning of the *Swift* opinion, *see* 318 F.3d at 253, the procedural posture of this case suggests that that standard should apply.  In both *Sequoia* and *Ridenour*, the Government's motion to dismiss came after the defendant had been served (and, in *Sequoia*, after the Government intervened), *see Ridenour*, 397 F.3d at 936 n.17 (reserving judgment as to whether a court may review Government's decision to dismiss "where the defendant has not been served and where the Government did not intervene in the action, facts of the sort presented in *Swift*"); *Sequoia*, 151 F.3d at 1142 (Government intervened after 60-day sealing period expired pursuant to good cause provision), whereas in *Swift* the Government moved to dismiss without intervening and before the defendant was served, *see Swift*, 318 F.3d at 250-51.  Here, while the Government apprised Citi of the existence of the complaint after the partial unsealing order, Citi has not been served, and the case otherwise remains under seal.  Deference to the Government here would thus comport with the Federal Rules of Civil Procedure:  under Rule 41(a)(1), a plaintiff may dismiss the complaint without a court order, and such a dismissal is not ordinarily subject to court review, *see* Fed. R. Civ. P. 41(a)(1); *Swift*, 318 F.3d at 252, whereas under Rule 41(a)(2), if defendant has answered plaintiff may dismiss "only by court order, on terms that the court considers proper," *see* Fed. R. Civ. P. 41(a)(2); *Swift*, 318 F.3d at 252-53.

*Corp.*, 473 F. App'x 849, 853 (10th Cir. 2012) (unpublished). The government has identified several valid purposes for dismissal: ending litigation duplicative of the claims it has already settled with Citi, *see id.* ("The government has a valid interest in ending duplicative litigation involving resolved claims."); deterring what it views as parasitic FCA claims, *see U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992) (FCA amendments intended to "strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists who attempt to capitalize on public information without seriously contributing to the disclosure of the fraud"); protecting the funds recovered in its settlement with Citi from distribution to individuals who, the Government maintains, did not contribute to the negotiation of the settlement, *see id.*; and avoiding the monetary and human capital costs to the Government that Relators' litigation of this case would entail,[6] *see Swift*, 318 F.3d at 254 ("the government's goal of minimizing its expenses," including "complying with discovery requests," is legitimate even if costs "would be relatively small"); *Sequoia*, 151 F.3d at 1146 ("[T]he government can legitimately consider the burden imposed on the taxpayers by its litigation, and that, even if the relators were to litigate the FCA claims, the government would continue to incur enormous internal staff costs."); *Piacentile*, 2013 WL 5460640, at *3 (Government's "preference to avoid expending further resources on this action" legitimate). Dismissing Relators' claims is rationally related to those objectives.

The burden thus falls to Relators to show that dismissal would be "fraudulent, arbitrary and capricious, or illegal." *Ridenour*, 397 F.3d at 937 (internal quotation marks omitted). This

---

[6] Although the Government could decline to intervene and allow relators to litigate their claims on their own, the Government submits, reasonably, that it would still be subject to substantial costs in the form of producing data and documents, reviewing them for privilege, generating privilege logs, defending government witnesses at depositions and seeking protective orders. (*See* Memorandum of Law of the United States in Support of its Motion to Dismiss ("Govt. Mem.") 24 n.8.)

they have failed to do.  Relators assert that the Government "duped" them into agreeing to the

partial unsealing of the case, allowing the Government to disclose the Complaint to Citi, settle

claims substantially similar to those in the Complaint, carve out Relators from the settlement,

and enter into a "wink" agreement with Citi to dismiss the Complaint, thereby defrauding

Relators of a share of the settlement.  This theory is insufficient to establish fraud.  First, there is

no support for the contention that Relators were duped into agreeing to a partial unsealing; the

Government was candid about its intentions when it contacted Amico, and both Relators and

their counsel consented.  (*See* Meister Decl. Ex. G.)  Relators had no reason to believe, as they

claim they did, that the Government was requesting permission to intervene and serve

Defendants, (*see* Amico Decl. ¶ 40), which the Government may do "as of right" under §

3730(b)(2) and § 3730(b)(4)(A), *see Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 99 (2d

Cir. 2009).  If Relators interpreted the request that way, they are responsible for their

misunderstanding;[7] there is nothing misleading about the Government's request.[8]

Assuming the truth of the remainder of Relators' argument – and the Government

concedes that it did inform Citi that it would move to dismiss the Complaint, (Govt. Mem. 4) –

Relators have not demonstrated fraud.  There is nothing novel about excluding *qui tam* claims

from Government settlements, *see Piacentile*, 2013 WL 5460640, at *4 (settlement between

---

[7] In correspondence to the Court, (*see* Letter from Stephen B. Meister, dated September 29, 2014), although not in their brief or affidavits, Relators claim that they believed that the Government's statement to Amico when Relators were *pro se* that the Government would move to dismiss "unless counsel [was] obtained" was a promise that the Government would never move to dismiss on any other ground if counsel was obtained.  Any such belief is similarly an unreasonable interpretation of Relators' own making.

[8] Relators also contend that they never had the opportunity to review the proposed order submitted to the Court and that the statement in the order that the case will remain under seal until further Court order violates the FCA's mandatory unsealing provision.  (*See* Relators' Memorandum of Law in Opposition to the United States' Motion to Dismiss ("Relators' Mem.") 2; Meister Decl. Ex. B.)  But the Court considered Relators' subsequent request to unseal the case and ordered that the seal should not be lifted until after resolution of the present motion, (*see* Endorsed Letter Denying Application, dated October 7, 2014), so the Government's submission to the Court of the proposed order has not deprived Relators of an opportunity to be heard on the issue.

Government and Defendant excluded relators' claims), and indeed Relators' claims are not the only ones excluded from the settlement, (*see* Grigsby Decl. Ex. A ¶¶ 12(i)-(k)). Nor have Relators explained why the Government informing Citi of its intent to seek to dismiss Relators' claims is anything but within the prerogative of the Executive, *see Stevens*, 162 F.3d at 201 (Government has "ample authority, whether through settlement or dismissal, to bring the litigation [of *qui tam* claims] to an early end"), let alone conduct that somehow defrauds Relators.

There may be some conceivable circumstance in which the Government engages in fraud by receiving a *qui tam* complaint, investigating and settling its claims, and then moving to dismiss for no purpose other than to prevent the deserving relator from receiving a share of the proceeds, *see U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 648-49 (6th Cir. 2003) (interpreting FCA's alternate remedy provision as preventing such situations), but this is not such a case. Relators' theory that the strength of the allegations in the Complaint caused a $3 billion jump in Citi's settlement offer (or caused the settlement itself) is implausible given the timeline of events. Relators do not dispute that the Department of Justice and the United States Attorney's Offices for the District of Colorado and the Eastern District of New York had been investigating Citi's RMBS practices since 2012, or that the Government and Citi had been negotiating a settlement since late 2013. (*See* Declaration of Kevin Traskos ¶¶ 2-6; Declaration of Richard K. Hayes ¶¶ 2-5.) The Government submits via declaration that the final settlement numbers were proposed on June 20, 2014, the parties exchanged drafts of an agreement reflecting those numbers between July 5 and July 10, 2014, and the agreement was signed on July 11, 2014. (Grigsby Decl. ¶¶ 2, 5.) Relators do not dispute those dates, and have given the Court no reason to suspect that the disclosure of the Complaint on July 10 had any effect on the

settlement signed July 11 (other than to include this case in the list of carved-out actions). Their accusation that the Government disclosed the Complaint (or Amico's declaration pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act) before the partial unsealing order is unsubstantiated and denied by declaration, (*see id.* ¶ 3; Supplemental Declaration of Stacey K. Grigsby ¶ 2), and is insufficient to defeat the presumption of good faith that attaches to executive action, *see United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[I]n the absence of clear evidence to the contrary, courts presume that [the Attorney General and United States Attorneys] have properly discharged their official duties."). Relators have thus failed to show that the Government's choice to move to dismiss is fraudulent, arbitrary or capricious, or illegal. *See Wickliffe*, 473 F. App'x at 854 (relators' "speculation, without more," "that their qui tam action provided a catalyst for, or evidence used in, settlement" of a substantively similar action was "insufficient to demonstrate the government [was] engaging in fraudulent, illegal, or arbitrary and capricious action"); *Nasuti ex rel. U.S. v. Savage Farms, Inc.*, No. 12-CV-30121, 2014 WL 1327015, at *12 (D. Mass. Mar. 27, 2014) (unsupported speculation about fraud insufficient to prevent dismissal of *qui tam* action).[9]

Relators argue that they need discovery to prove their allegations of fraud, but nothing in the FCA's *qui tam* provisions provides for discovery as of right. *See* 31 U.S.C. § 3730; *Nasuti*, 2014 WL 1327015, at *13. Relators are "not entitled to discovery of information relating to prosecutorial decisions absent a substantial threshold showing." *Swift*, 318 F.3d at 254; *see Wickliffe*, 473 F. App'x at 854 (relator not entitled to evidentiary hearing unless "substantial and particularized need" shown); *Nasuti*, 2014 WL 1327015, at *13 (same). As stated above,

---

[9] The Government's decision to move to dismiss on the alternate grounds of the first-to-file bar, *see* 31 U.S.C. § 3730(b)(5), the government action bar, *see id.* § 3730(e)(3), and the public disclosure bar, *see id.* § 3730(e)(4)(A), in addition to § 3730(c)(2)(A), in no way "acknowledg[es] that the Relators' fraud theory has merit," as Relators argue in their brief. (*See* Relators' Mem. 3.)

Relators have not plausibly alleged fraud on the part of the Government, and so are not entitled to discovery. *Cf. Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (modern pleading requirements "do[] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"). Relators have been granted their statutorily prescribed hearing, *see* 31 U.S.C. § 3730(c)(2)(A), by way of the pre-motion conference held August 1, 2014, and the Court's consideration of their submissions on this motion, *see Piacentile*, 2013 WL 5460640, at *2; *Greene v. I.R.S.*, No. 08-CV-280, 2008 WL 5378120, at *2 (N.D.N.Y. Dec. 23, 2008), *aff'd*, 348 F. App'x 625 (2d Cir. 2009); *Pentagen*, 2001 WL 770940, at *7 n.13. Dismissal under § 3730(c)(2)(A) is thus appropriate.

### C. Public Disclosure Bar

Alternatively, the Complaint should be dismissed under 31 U.S.C. § 3730(e)(4)(A), the FCA's public disclosure bar.

#### 1. *Retroactivity*

In March 2010, the Patient Protection and Affordable Care Act ("PPACA") amended Section 3730(e)(4)(A), and the parties disagree on whether the pre- or post-2010 version of the statute applies. Because the amendment makes no mention of retroactivity and effects a substantive change in the law, *see Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 283 n.1 (2010); *United States v. Univ. of Phoenix*, No. 10-CV-2478, 2014 WL 3689764, at *5 (E.D. Cal. July 24, 2014), the conduct alleged in the complaint should be "assessed under the law that existed when the conduct took place," *Hughes Aircraft*, 520 U.S. at 946 (internal quotation marks omitted); *see U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 354 (S.D.N.Y. 2014) ("Because the 2010 amendment is not retroactive, the pre-2010 [version of the public disclosure bar] applies to the Relator's allegations concerning

[defendant's] conduct from January 2007 to March 2010."); *see also United States v. Gill*, 748 F.3d 491, 499 (2d Cir. 2014) ("two-step test to determine whether a law should apply to conduct that occurred prior to the law's enactment" is (1) whether Congress defined retroactive reach and, if not, (2) whether application would unfairly affect past conduct).[10]

The false claims alleged in the Complaint are Defendants' false representations and material omissions in the Registration Statements of the RMBS and the Offering Documents of the CDOs. Those representations appear to have occurred in 2007; the Registration Statement for CMLTI 2007-AMC1 was filed with the SEC in March 2007, (Compl. ¶ 32 n.5), and although the date of disclosure of the CDO Offering Documents is not provided, the one example provided by Relators is dated February 2007, (*Id.* Ex. D; Amico Decl. Ex. E).[11]  While Relators have not provided the date of the Government's purchase of Defendants' various securities – *i.e.*, when the Government received the false claims – it is clear that any alleged purchases occurred before March 2010: Relators allege that that the Maiden Lane Entities, which owned RMBS and

---

[10] Relators argue that the date the Complaint was filed is determinative of the statute to be applied. (Relators' Mem. 23-24.) The Court is not persuaded. Relators cite two decisions that applied the version of the FCA in effect on the date of filing because those cases were filed – and thus obviously the events at issue occurred – before the 2010 amendments, *see Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 131 S. Ct. 1885, 1889 n.1, 1890 (2011) (complaint filed in 2005); *United States v. N.Y.C. Dep't of Hous., Pres. & Dev.*, No. 09-CV-6547, 2012 WL 4017338, at *3, *4 n.7 (S.D.N.Y. Sept. 10, 2012) (complaint filed in 2009), *aff'd sub nom. Monaghan v. Henry Phipps Plaza W., Inc.*, 531 F. App'x 127 (2d Cir. 2013), and the Supreme Court has stated that the amendments do not apply retroactively to "pending cases," *see Graham Cnty. Soil*, 559 U.S. at 283 n.1. These cases do not logically stand for the proposition that a case filed after March 2010 calls for automatic application of the post-amendment version of the statute. The only cases cited by Relators that seemingly adopt that view, *Ping Chen ex rel. U.S. v. EMSL Analytical, Inc.*, 966 F. Supp. 2d 282 (S.D.N.Y. 2013), and *U.S. ex rel. Siegel v. Roche Diagnostics, Corp.*, 988 F. Supp. 2d 341 (E.D.N.Y. 2013), do so without explanation or analysis. *See Ping Chen*, 966 F. Supp. 2d at 293; *Siegel*, 988 F. Supp. 2d at 344. They do not provide a basis for departing from the guidance of *Hughes Aircraft*, in which the Supreme Court found that the 1986 amendment to the public disclosure bar was not retroactive and therefore applied the pre-1986 version of the statute in a case that was filed in 1989 but alleged false claims that were submitted between 1982 and 1984. *See Hughes Aircraft*, 520 U.S. at 943-52; *see also Univ. of Phoenix*, 2014 WL 3689764, at *5-6 (pre-2010 statute applied to case filed in September 2010 where fraud occurred in 2009); *Bloedow v. Planned Parenthood of the Great Nw. Inc.*, No. 11-CV-1192, 2013 WL 6631771, at *1-2 (W.D. Wash. Dec. 16, 2013) (pre-2010 statute applied to case filed in 2011 where fraud occurred from 2003-2009).

[11] The Citi RMBS identified in Annex A to the Complaint all contain dates of 2008 or earlier, and the Citi CDOs listed in Annex B, to the extent they contain dates, are dated 2007 and earlier.

CDOs, were created in 2008 to respond to the financial crisis and purchased CMLTI 2007-AMC1 certificates "in or around" December 2008, (Compl. ¶¶ 2, 140, 146), the Federal Reserve Bank of New York was advised to purchase CMLTI 2007-AMC1 certificates in December 2008, (*id.* ¶ 3), the U.S. Department of Treasury's Public-Private Investment Partnership, which allegedly purchased RMBS, was created in 2009, (*id.* ¶ 141), Fannie Mae and Freddie Mac, due in part to their purchase of RMBS and CDOs, were placed into conservatorship in September 2008, (*id.* ¶ 150), and the Government "invest[ed]" $45 billion in Citi through its recovery programs in late 2008, (*id.* ¶ 153). In all respects, the Complaint clearly alleges fraudulent conduct that took place before March 2010.[12] (*See, e.g., id.* ¶ 11 (Defendants knew mortgage quality underlying CDOs was declining "from the period 2004 through mid-2007"); *id.* ¶ 32 (CMLTI 2007-AMC1 trust closed on March 9, 2007); *id.* ¶ 34 (valid assignments underlying trust not delivered on closing date); *id.* ¶ 83 (defendants securitized billions of dollars in mortgage loans from 2003-2006); *id.* ¶ 94 (third-party due-diligence firm found loans collateralizing securities failed to comply with underwriting standards in 2006 and 2007); *id.* ¶¶ 95-96 (Citi executive Richard Bowen identified defective mortgages in 2006); *id.* ¶ 102 (Citi acquired $45-$55 billion of its own CDOs by November 2007); *id.* ¶ 105 (Defendants knew of

---

[12] Relators' argument that substantial conduct occurred after 2010 is unavailing. (*See* Relators' Mem. 23 n.12). The allegations to which they point consist of the damages suffered by the Government when the toxic securities were finally sold for a loss, (Compl. ¶¶ 2, 146), the sale and resulting loss when the properties underlying the RMBS were ultimately foreclosed or sold in "short sales," (*id.* ¶¶ 47, 64-65, 67, 74-75), and the ripple effects of the fraud after it was discovered, (*id.* ¶ 131; *id.* Annex D). These incidents may constitute effects or proof of the fraud alleged, but they are not the fraud itself. *See Bloedow*, 2013 WL 6631771, at *2 ("Plaintiff must proceed under the statute in effect at the time of Defendant's alleged false claims."). Paragraph 38 of the Complaint discusses the alleged May 2012 assignment to the CMLTI 2007-AMC2 trust (perhaps as part of a foreclosure action) of a particular mortgage that should have been assigned to the CMLTI 2007-AMC1 trust when that trust closed in March 2007. But the 2012 assignment only evidences the larger allegation that 98.5% of the loans reviewed by Relators were not assigned to CMLTI 2007-AMC1 by the March 2007 closing date. (*See* Compl. ¶¶ 35-38.) Any alleged fraud on investors in the trust or on the Government was long complete by May 2012. The assignment at that time may be post-March 2010 *evidence*, but it is evidence of a pre-March 2010 fraud.

poor quality of mortgages by early 2006); *id.* ¶ 131 (Citi-RMBS downgraded by Moody's in

2007).) The pre-2010 version of the public disclosure bar thus applies.

### 2. *Public Disclosures*

The pre-amendment version of the public disclosure bar provides that

> [n]o court shall have jurisdiction over an action under this section
> based upon the public disclosure of allegations or transactions in a
> criminal, civil, or administrative hearing, in a congressional,
> administrative, or Government Accounting Office report, hearing,
> audit, or investigation, or from the news media, unless the action is
> brought by the Attorney General or the person bringing the action is
> an original source of the information.

31 U.S.C. § 3730(e)(4)(A) (2006). "[U]nder both the pre- and post-2010 versions of the statute,

courts assess whether the allegations in a *qui tam* complaint are 'substantially the same' as or

'substantially similar' to the allegations of fraud contained in the public disclosures in question."

*Kester*, 43 F. Supp. 3d at 346 (quoting *Ping Chen*, 966 F. Supp. 2d at 297-98 & n. 11).[13] The

---

[13] The current statute reads: "The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media . . . ." 31 U.S.C. § 3730(e)(4)(A). Thus the primary differences between the pre- and post-2010 versions are the removal of the phrase "[n]o court shall have jurisdiction over" from the old version and the new requirement that any criminal, civil, or administrative hearing must be "Federal" and the Government or its agent must be a party. Courts are split on whether the current version of the public disclosure bar remains jurisdictional, or operates instead as a dismissal on the merits. *See Kester*, 43 F. Supp. 3d at 345; *Ping Chen*, 966 F. Supp. 2d at 293-94.

Though the pre-amendment version of the statute applies here, the result would be the same under the current version. As explained below, the cases that foreclose Relators' claims are federal cases to which the Government or its agents was a party – two were brought by Government agencies and one is a *qui tam* complaint on behalf of the Government. *See U.S. ex rel. Beauchamp v. Academi Training Ctr., Inc.*, 933 F. Supp. 2d 825, 842 (E.D. Va. 2013) (*qui tam* suit is one in which the Government or its agent is a party). Whether or not the current statute is jurisdictional affects the allocation of the burden of proof, *see Ping Chen*, 966 F. Supp. 2d at 294, but I find the bar applies regardless of which party bears the burden of proof. And if the bar were not jurisdictional and thus the proper standard for dismissal were the same as under Fed. R. Civ. P. 12(b)(6), I could nevertheless consider the parties' evidentiary submissions to the extent they consist of prior court filings, which are public documents of which I may take judicial notice (not for the truth of the matters asserted but for the fact they were said). *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a

inquiry focuses on whether the public source "disclosed all the essential elements of the alleged fraud." *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 437 F. App'x 13, 17 (2d Cir. 2011) (summary order). "In other words, the question is whether the information conveyed in the public disclosures could have formed the basis for a governmental decision on prosecution, or could at least have alerted law-enforcement authorities to the likelihood of wrongdoing." *Kester*, 43 F. Supp. 3d at 347 (internal quotation marks and alteration omitted); *see Ping Chen*, 966 F. Supp. 2d at 298 (public disclosure must be "sufficient to set the government squarely upon the trail of the alleged fraud") (internal quotation marks omitted).

Relators' RMBS claims are substantially similar to those in *Federal Housing Finance Agency v. Citigroup Inc.*, No. 11-CV-6196 (S.D.N.Y. Sept. 2, 2011), in which the Federal Housing Finance Agency ("FHFA") alleged that Citi sold RMBS to Fannie Mae and Freddie Mac "pursuant to registration statements, including prospectuses and prospectus supplements that formed part of those registration statements, which contained materially false or misleading statements and omissions," including that Citi "falsely represented that the underlying mortgage loans complied with certain underwriting guidelines and standards, including representations that significantly overstated the ability of the borrowers' to repay their mortgage loans." (Martin Decl. Ex. 1, "FHFA Compl." ¶ 1.)[14]  The FHFA Complaint states:  (1) that a "loan level analysis" revealed that the Registration Statements falsely represented "the percentage of loans secured by owner-occupied properties," (*id.* ¶¶ 6, 93-96, 109-12), and the percentage of loans "with loan-to-value ratios within specified ranges," (*id.* ¶¶ 6, 97-102, 113-18), and omitted facts related to "inflated property values," (*id.* ¶ 6); and (2) that these misrepresentations resulted in

---

document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

[14] "Martin Decl." refers to the Declaration of Rebecca C. Martin, dated October 8, 2014.

misleading credit ratings, (*id.* ¶ 107). It details the roles Citi and its various subsidiaries –
including Defendants Realtycorp, CMLTI, and Global Markets – played in the securitization
process, (*see id.* ¶¶ 47-60), and alleges that they did not "conduct adequate and sufficient due
diligence to ensure that the mortgage loans underlying the Securitizations complied with the
representations in the Registration Statements," (*id.*¶ 69). These allegations are more than
substantially similar to Relators' allegations; they are nearly identical.

Similarly, Relators' assignment allegations – that title to the majority of the loans was not
delivered to the RMBS trusts, (*see* Compl. ¶¶ 33-40) – are substantially the same as those in *U.S.
ex rel. Szymoniak v. Am. Home Mortg. Servicing, Inc.*, No. 10-CV-1465 (D.S.C. Feb. 3, 2014),
(*see* Martin Decl. Ex. 5 ¶¶ 5-6 ("[L]awfully executed mortgage assignments[] were required to
have been delivered at the inception of the MBS Trust, and Defendants[, including Citibank and
CitiMortgage,] repeatedly certified that the MBS Trusts complied with that requirement . . . [but]
the MBS Trusts were never assigned the notes."); *id.* ¶ 8 ("Defendants concealed that the notes
and assignments were never delivered to the MBS Trusts."); *id.* ¶ 114 ("Without the valid
mortgage assignments and properly endorsed notes, the value of the assets in the trust are
severely diminished because the trustee is unable to establish clear chain-of-title to pursue a
foreclosure action.")). Thus dismissal of Relators' RMBS claims under the public disclosure bar
is appropriate.

The same can be said of Relators' CDO claims and the complaint in *S.E.C. v. Citigroup
Global Markets Inc.*, No. 11-CV-7387 (S.D.N.Y. Oct. 19, 2011), in which the SEC alleged that
the pitch book and Offering Documents prepared by Citi for its Class V III CDOs omitted that
Citi hand-selected assets to back the CDOs and subsequently took a short position on them. (*See*
Martin Suppl. Decl., Ex. 22 ¶¶ 2-3, 57; *see also* Martin Decl., Ex. 3 ¶¶ 2-3, 57-60 (complaint in

*S.E.C. v. Stoker*, No. 11-CV-7388 (S.D.N.Y. Oct. 19, 2011), making same allegations in

securities fraud action against former Citi employee.).)[15] These are the essential elements of

Relators' CDO claims.[16] (*See* Compl. ¶ 104.) While the *S.E.C. v. Citigroup* complaint focuses

exclusively on the Class V III CDO, (*see* Martin Suppl. Decl., Ex. 22 ¶ 1), and Relators refer to

many others in their Complaint, (*see* Compl. Annex B), the allegations made by the SEC indicate

that the Government "had enough information to be alerted to the exact fraudulent scheme

alleged by Relator[s]," *Kester*, 43 F. Supp. 3d at 352, or at the very least to be "squarely upon the

trail of the alleged fraud," *Ping Chen*, 966 F. Supp. 2d at 298. These complaints qualify as

public disclosures because they were filed in "civil . . . hearing[s]." 31 U.S.C. § 3730(e)(4)(A)

(2006); *See N.Y.C. Dep't of Hous.*, 2012 WL 4017338, at *4 ("[F]iling litigation papers is a

public disclosure for purposes of § 3730.").[17] Thus Relators' claims are barred.

Relators concede that their general allegations have been made in public reports and

litigations before this one, but argue that their Complaint is unique because Relators have

"independently developed" loan-level "borrower and property specific evidence." (*See* Relators'

Mem. 25-28 (emphasis omitted).) This argument is mistaken; the previously disclosed

allegations Relators dismiss as "generalized" – "that the underlying mortgage loans were not

originated in accordance with the underwriting standards and origination practices set forth in the

---

[15] "Martin Suppl. Decl." refers to the Supplemental Declaration of Rebecca C. Martin, dated February 11, 2015.

[16] To the extent the Complaint alleges that that the CDOs suffered from the same misrepresentations and omissions as those underlying the RMBS, (*see* Compl. ¶¶ 135-37), those claims are substantially the same as the disclosures in the RMBS cases cited above. The same is true of the SIV claims.

[17] This is to say nothing of the substantial federal investigative reports and news media coverage of Citi's RMBS and CDO practices, (*see* Martin Decl. Exs. 9, 11-13), of which I also may take judicial notice (not for their truth but for the fact that the statements were made). *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.").

registration statements; that the owner occupancy rates and loan-to-value ratios of the mortgage

pools set forth in the registration statements were false; and that the ratings on the RMBS were

inflated," (*id.* at 25 (emphasis omitted)) – are "the essential elements," *Kirk*, 437 F. App'x at 17,

of their FCA claims, (*see* Compl. ¶¶ 154-67). Indeed, their two claims for relief are couched in

language even more general than that. (*See, e.g., id.* ¶ 155 ("Defendants . . . omitted to disclose

material information and made false representations about the quality of the mortgage loans

included in the Citi-RMBS . . . and omitted to correct these material omissions and false

representations thereafter.")). And, in any event, the public disclosure bar does not require

"complete identity between the two sets of allegations." *Kester*, 43 F. Supp. 3d at 350. "[T]he

fact that the Relator[s] provided more information about the scheme does not mean that the

[prior] public disclosures about [Defendants] did not expose all the *essential* elements of the

alleged fraud." *Id.* (internal quotation marks omitted) (emphasis in original); *see In re Natural*

*Gas Royalties*, 562 F.3d 1032, 1040 (10th Cir. 2009) (inclusion of additional details in *qui tam*

complaint does not prevent application of public disclosure bar); *U.S. ex rel. Springfield*

*Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 655 (D.C. Cir. 1994) (where material elements of fraud

already public, *qui tam* action cannot be maintained where relator merely "comes forward with

additional evidence incriminating the defendant"); *U.S. ex rel. Kreindler & Kreindler v. United*

*Techs. Corp.*, 985 F.2d 1148, 1158 (2d Cir. 1993) (public disclosure bar applied even though

"[Relator] did not obtain the pertinent information 'solely' from [publicly disclosed] material,

but also through independent investigation").

### 3. *Original Source*

Relators could avoid the public disclosure bar if they were an "original source" of the

publicly disclosed information, *see Kreindler*, 985 F.2d at 1158, but the Court finds that they are

not. For the reasons stated above, the pre-2010 definition of "original source" applies. *See Kester*, 43 F. Supp. 3d at 354. Under that version of the statute, an "original source" is a *qui tam* plaintiff who "(1) ha[s] direct and independent knowledge of the information on which the allegations are based, and (2) ha[s] voluntarily provided such information to the government prior to filing suit." *Kreindler*, 985 F.2d at 1159 (quoting *U.S. ex rel. Dick v. Long Island Lighting Co.*, 912 F.2d 13, 16 (2d Cir. 1990)); *see Kester*, 43 F. Supp. 3d at 354 (citing 31 U.S.C. § 3730(e)(4)(B) (2006)). The Second Circuit has also read a third element into the definition: that a relator "must have directly or indirectly been a source to the entity that publicly disclosed the allegations on which a suit is based." *Kreindler*, 985 F.2d at 1159 (quoting *Dick*, 912 F.2d at 16); *accord United States v. N.Y. Med. Coll.*, 252 F.3d 118, 120 (2d Cir. 2001). Relators have unequivocally not met this third requirement, and do not argue that they were directly or indirectly a source to the plaintiffs in the cases cited above. They have thus failed to establish that they are an original source under the statute. *See* 31 U.S.C. § 3730(e)(4)(B) (2006).[18]

Dismissal here is consistent with the purpose of the public disclosure bar and original source provision, which are "designed to preclude *qui tam* suits based on information that would

---

[18] The result would be the same under the current statute, which defines "original source" as "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B). Relators argue they meet the second prong of the definition because they conducted original research that produced previously unknown loan, borrower, and property data. Even assuming their knowledge is "independent" and that they properly disclosed it to the Government before filing the Complaint, they have not "materially add[ed]" to the publicly disclosed allegations. *See id.* A *qui tam* complaint does not "materially add" to publicly disclosed information by merely providing details or background information about an already-disclosed fraud. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 815 (11th Cir. 2015) (relator did not materially add to public disclosure where complaint "at most" provided "background information and details"); *Beauchamp*, 933 F. Supp. 2d at 843 (relator did not materially add to public disclosure by "add[ing] only illustrative examples" of fraud). Relators were not the first to conduct a loan-level review of Citi's securitization process, nor the first to file a lawsuit based on the findings of such a review. (*See* FHFA Compl. ¶¶ 108-18; Martin Decl. Ex. 12.) Relators' review of 675 loans, (Compl. ¶ 33), 50 borrowers, (*id.* ¶ 41), and 50 properties (*id.* ¶ 60), among the countless thousands tied up in Citi's multibillion dollar RMBS business, thus cannot be said to have materially added to the Government's years-long investigation of the same issues.

have been equally available to strangers to the fraud transaction had they chosen to look for it as it was to the relator." *Kreindler*, 985 F.2d at 1158 (internal quotation marks omitted). These provisions prevent the "[p]otential accessibility by those not a party to the fraud," *Doe*, 960 F.2d at 322, because the FCA is intended to provide "incentives for whistle-blowing insiders with genuinely valuable information" to become relators, *see Graham Cnty. Soil*, 559 U.S. at 294. Relators here are not insiders. Amico worked at Citi from 2000 to 2002 and Mayers from 1997 to 2003; both were gone long before the events at issue transpired. There is no evidence that they learned of the fraud through any particular relationship with Defendants. Instead, Relators offer that they obtained the information by "hiring researchers" to review online real estate records and call record clerks regarding the mortgages described on the loan tapes. (*See* Relators' Mem. 34-35.) That Relators had the diligence or skill to obtain further evidence of fraud – by, for example, decoding the loan tapes – is immaterial. *See Kreindler*, 985 F.2d at 1159 ("[T]he fact that [relator's] background knowledge enabled it to understand the significance of the information" did not "make its knowledge independent of the publicly disclosed information."). "If that were enough to qualify the relator as an 'original source,' then a cryptographer who translated a ciphered document in a public court record would be an 'original source,' an unlikely interpretation of the phrase." *Id.* (internal quotation marks omitted).

## III.   CONCLUSION

For the foregoing reasons, the Government's Motion to Dismiss is GRANTED pursuant to 31 U.S.C. § 3730(c)(2)(A) or, in the alternative, 31 U.S.C. § 3730(e)(4)(A).[19] All claims are dismissed. The Clerk of Court is respectfully directed to terminate the pending motion and close the case.

---

[19] Given these alternate grounds for dismissal, the Court need not reach the Government's remaining arguments regarding the first-to-file bar, 31 U.S.C. § 3730(b)(5), or the government action bar, *id.* § 3730(e)(3).

22

The parties are directed to submit letter briefs within 14 days of this Order advising the

Court of their positions regarding whether there is any further need to keep the case under seal.


**SO ORDERED.**

Dated: June 8, 2015
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.